IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARC RAMIREZ                          :
                                      :
              Plaintiff               :          Case No. 4:97-CV-0359
      v.                              :
                                      :          (Judge McClure)
MICHAEL V. PUGH, et al.               :
                                      :
              Defendants.             :

# M E M O R A N D U M

March 29, 2007

This is a civil rights case concerning the constitutionality of statutory and

regulatory restrictions that prevent federal inmates from receiving pornography.

Initially, this court found that such restrictions were constitutional because they

met the constitutional requirements set forth in <u>Turner v. Safley</u>, 482 U.S. 78

(1987).  In doing so, we found that the restrictions were rationally connected to

legitimate penological interests concerning rehabilitation and institutional security.

The United States Court of Appeals for the Third Circuit reversed and remanded,

directing the court to allow a factual record to first develop before ruling on the

constitutionality of the restrictions in question.  <u>See</u> <u>Ramirez v. Pugh</u>, 379 F.3d 122

(3d Cir. 2004).  Discovery has now ended, and both plaintiff and defendants have

filed cross motions for summary judgment.  After reviewing the developed factual

1

record, we find that the statutory and regulatory restrictions in question are

rationally related to the legitimate penological interests of rehabilitation and

institutional security, meet the reasonableness requirements set forth under Turner,

and therefore are constitutional.  For the reasons stated below, we will grant

defendants' motion for summary judgment.

**BACKGROUND:**

I.  Procedural History

In 1997, Congress authorized legislation and the BOP promulgated

regulations that essentially prohibited federal prisoners from receiving

pornography.  On March 7, 1997, Plaintiff Marc Ramirez, an inmate presently

confined at the Allenwood Low Security Correctional Institution, White Deer,

Pennsylvania ("LSCI-Allenwood"), initiated this civil rights action pursuant to 28

U.S.C. § 1331.  He named as defendants the former United States Attorney Janet

Reno, Kathleen Hawk, Director of the Federal Bureau of Prisons ("BOP"), and

LSCI-Allenwood Warden Michael V. Pugh.  Plaintiff claims that these restrictions

violate his First Amendment rights because the restrictions prevent him access to

publications such as Playboy and Penthouse.

On March 27, 1997, plaintiff's amended complaint was dismissed without

prejudice for failure to exhaust administrative remedies.  The Third Circuit

reversed and remanded for further proceedings. Because the United States Court of Appeals for the District of Columbia was considering a similar issue, we stayed all proceedings pending final disposition of <u>Amatel v. Reno</u>, 975 F. Supp. 365 (D.D.C. 1997).[1] On March 8, 2000, after <u>Amatel</u> was decided, we lifted the stay.

On February 28, 2002, we granted defendants' motion to dismiss the amended complaint. We found that the restrictions on pornography were constitutional in part because "Congress could have reached a rational conclusion that bans on sexually explicit materials would promote rehabilitation and institutional security." (February 28th Memorandum and Order, Rec. Doc. No. 61, at 10.) On August 12, 2004, the Third Circuit reversed our decision, and remanded the matter instructing the court to "first identify with particularity the specific rehabilitative goals advanced by the government to justify the restriction at issue, and then give the parties the opportunity to adduce evidence sufficient to enable a determination as to whether the connection between these goals and the restriction is rational under <u>Turner</u>." <u>Ramirez</u>, 379 F.3d at 128.[2]

---

[1] On appeal in <u>Amatel</u>, the D.C. Circuit determined the restrictions on prisoner access to pornography were constitutional and that a factual record was not necessary to conclude that these restrictions were rationally related to legitimate penological interests. 156 F.3d 192 (D.C. Cir. 1998).

[2] Although we stated in our February 28th order that the restrictions were rationally related to institutional security, the Third Circuit found the order focused

The parties have conducted discovery, which has ended.[3]  Plaintiff and

defendants have filed cross motions for summary judgment.  Both motions are ripe

for disposition.[4]

## II.  Ensign Amendment and BOP Regulations

The restrictions in question stem from what is known as the Ensign

Amendment, which was originally enacted as part of the Omnibus Consolidated

Appropriations Act of 1997.  See Pub. L. No. 104-208, § 614, 110 Stat. 3009

(1996).  The amendment, which has been reenacted in each subsequent

appropriations act and is now codified at 28 U.S.C. § 530C(b)(6), prohibits the

Bureau of Prisons ("BOP") from using federal funds to "distribute or make

available any commercially published information or material to a prisoner when it

exclusively on the penological interest of rehabilitation.  See Ramirez, 379 F.3d at
131 n.5.

[3]  We note for the record that plaintiff has withdrawn both his demand for
monetary damages and a request for a jury trial.  (Rec. Doc. No. 80).  As a result,
we deemed the claims against defendants in their individual capacities as being
withdrawn, and found that any arguments concerning qualified immunity would be
moot.  (Rec. Doc. No. 85.)

[4]  At our request to the pro bono chair of the Middle District of Pennsylvania
Chapter of the Federal Bar Association, Robert B. Elion, Esquire, entered his
appearance, pro bono, on behalf of plaintiff on December 20, 2004.  We are most
grateful for the exemplary professional manner in which he, David C. Shipman,
Esquire, and their firm Elion, Wayne, Grieco, Carlucci, Shipman & Irwin, P.C.
have represented the plaintiff.

is made known to the Federal official having authority to obligate or expend such funds that such information or material is sexually explicit or features nudity." Id.

To help implement this congressional mandate, the BOP has promulgated regulations that define some of the amendment's key terms. For instance, under the BOP regulations, "sexually explicit" means "a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation." 28 C.F.R. § 540.72(b)(4). "Nudity" means "a pictorial depiction where genitalia or female breasts are exposed," and "features" means "the publication contains depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues." 28 C.F.R. § 540.72(b)(2) and (3). The BOP regulations specifically exempt nudity used for medical, educational, or anthropological purposes from the definition of "features." Id. Under these guidelines, certain publications from the National Geographic and the swimsuit issue of Sports Illustrated are not considered prohibited publications. Fed. Bureau of Prisons Program Statement 5266.07 (Nov. 1, 1996). As the Third Circuit noted, the regulations "are clearly targeted to the receipt by inmates of softcore and hardcore pornography." Ramirez, 379 F.3d at 125.

**DISCUSSION:**

<u>I.  Legal Standard Governing Summary Judgment</u>

It is appropriate for a court to grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled a judgment as a matter of law."  Fed. R. Civ. P. 56©.

"If the nonmoving party has the burden of persuasion at trial, 'the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'" <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 706 (3d Cir. 1989) (quoting <u>Chippolini v. Spencer Gifts, Inc.</u>, 814 F.2d 893, 896 (3d. Cir. 1987)); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

In evaluating a motion for summary judgment, the court will draw all reasonable inferences from the evidence in the record in favor of the nonmoving party.  <u>Am. Flint Glass Workers Union v. Beaumont Glass Co.</u>, 62 F.3d 574, (3d Cir. 1995).  The nonmoving party, however, cannot defeat a motion for summary judgment by merely offering general denials, vague allegations, or conclusory

statements; rather the party must point to specific evidence in the record that creates a genuine issue as to a material fact.  See Celotex, 477 U.S. at 32; Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Issues of fact are "genuine only if a reasonable jury, considering the evidence presented could find for the nonmoving party."  Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988).  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment.  Id.

## II.  Legal Standard Applicable to Restrictions on Prisoner Rights

When considering the constitutionality of restrictions on prisoners' rights, there exists a tension between the principle that prisoners do not lose their constitutional protections merely because they are prisoners, with the "practical reality that the judicial branch is ill-suited for running the country's prisons, a task committed to the particular expertise of the legislative and executive branches." Ramirez, 379 F.3d at 126 (citing Turner, 482 U.S. at 84-85).  To resolve this tension, the Supreme Court in Turner held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Turner, 482 U.S. at 89.

To carry out this inquiry, the Turner court set forth a four-factor test, which the Third Circuit considers as a two-step analysis.  First, a district court must

7

determine whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Jones v. Brown, 461 F.3d 353, 360 (3d Cir. 2006) (citations omitted).

Second, if the court finds a rational relationship exists, then it must consider the other three factors enunciated in Turner's overall reasonableness test. These factors include "(1) whether inmates retain alternative means of exercising the circumscribed right, (2) the burden on prison resources that would be imposed by accommodating the right, and (3) whether there are alternatives to the regulation that fully accommodate the prisoners' rights at de minimis cost to valid penological interests." Id. (citations omitted). The Turner analysis presupposes that the prisoner regulation restricts a constitutionally protected right in the first place. Jones, 461 F.3d at 358.

The Supreme Court has ruled that "the burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." Overton v. Bazzetta, 539 U.S. 126, 132 (2003). When considering the government's summary judgment motion, however, "the defendant administrators must 'put forward' the legitimate governmental interests alleged to justify the regulation, and

8

'demonstrate' that the policy drafters 'could rationally have seen a connection' between the policy and [that interest]." <u>Brown</u>, 461 F.3d at 353 (citations omitted). The Third Circuit has stated that though this burden may be slight, it "must amount to more than a conclusory assertion." <u>Id</u>.  Indeed, as required by the standard governing summary judgment, defendants must demonstrate in their summary judgment motion that there is "an absence of a genuine issue of material fact" and that they are entitled to judgment as a matter of law.  <u>Banks v. Beard</u>, 126 S. Ct. 2572, 2578 (2006).  If they succeed, then the plaintiff, as the party with the ultimate burden of persuasion, must "set forth specific facts showing that there is a genuine issue for trial." <u>Id</u>. (citations omitted).[5]

In considering these burdens, however, the Supreme Court commands that courts "distinguish between the evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities." <u>Id</u>.  Therefore, we must "accord

---

[5] Defendants argue in their brief that the Third Circuit erred by reversing our February 28th order and permitting plaintiff's claim to proceed into discovery.  By doing so, defendants argue, the Third Circuit impermissibly placed the burden on the defendants to prove the constitutional validity of the Ensign Amendment and the BOP regulations, in direct contradiction with the Supreme Court's deference mandate in <u>Overton</u>.  Because we find the defendants met their summary judgment motion burden, we need not consider whether the Third Circuit's reversal of our February 28th order conflicts with the Supreme Court's precedent in <u>Overton</u>.

substantial deference to the professional judgment of prison administrators."

Overton, 539 U.S. at 132.  "Unless a prisoner can point to sufficient evidence

regarding such issues of judgment to allow him to prevail on the merits, he cannot

prevail at the summary judgment stage." Banks, 126 S. Ct. at 2578.

Plaintiff argues that Playboy and Penthouse are soft-core, non-obscene

materials, receipt of which is constitutionally protected.  As a result, he asserts that

the Ensign Amendment and BOP regulations' restrictions on Playboy and

Penthouse must meet the requirements of Turner's four-part test.  See Ramirez,

379 F.3d at 129 n.2 ("To the extent that the Ensign Amendment and its

implementing regulation target non-obscene material . . . its proscriptions must

satisfy the requirements of Turner").  There appears to be no dispute that Playboy

and Penthouse come within the prohibition of the Ensign Amendment and the BOP

regulations as materials which "feature nudity."  And there also appears to be no

dispute that Turner applies to the Ensign Amendment and BOP regulations'

restrictions on Playboy and Penthouse because receipt of such soft-core, non-

obscene materials is constitutionally protected.[6]  Therefore, we will review the

restriction on Playboy and Penthouse under Turner's four-part analysis,

_____

[6] Plaintiff does not appear to challenge the Ensign Amendment and BOP
regulations' application to sexually explicit or obscene materials.  Therefore, we
will not consider the Ensign Amendment's application to such materials.

determining first whether defendants have met their summary judgment burden, and if so, whether plaintiff has successfully rebutted defendants' evidence.  When considering a difference in professional judgment between the plaintiff's and defendants' respective experts, we will defer to the defendants.

### A.  Rational Connection to Legitimate Penological Interests

Under the first prong of the <u>Turner</u> analysis, we must determine whether the Ensign Amendment and the BOP regulations have a "'valid, rational connection' to a legitimate and neutral governmental objective." <u>Waterman v. Farmer</u>, 183 F.3d 208, 214 (3d Cir. 1999) (quoting <u>Turner</u>, 482 U.S. at 89-90).  A statute or regulation will fail to meet this prong if it promotes only an illegitimate or non-neutral interest, or if it bears no rational connection to the legitimate penological interest.[7] <u>Waterman</u>, 183 F.3d at 214 (citing <u>Turner</u>, 482 U.S. at 89-90).  This first factor "looms especially large because it tends to encompass the remaining factors, and some of its criteria are apparently necessary conditions." <u>Id</u>. (citations omitted).

The defendants put forward two penological interests they argue are served by the Ensign Amendment and the BOP's regulations: (1) rehabilitation and (2)

_____

[7] Plaintiff does not argue that the Ensign Amendment and BOP regulations are not neutral.  Therefore, this issue is waived.

institutional security.[8]   Therefore, we will review each penological interest in turn, focus on the specific goals served under each interest, and then determine whether the Ensign Amendment and BOP regulations' restriction on prisoner possession of Playboy and Penthouse is rationally connected to these specific goals.  See Ramirez, 379 F.3d at 128 (directing the court to "identify with particularity the specific rehabilitative goals advanced by the government to justify the restriction at issue...[then determine] as to whether the connection between these goals and the restriction is rational under Turner.").[9]

### 1. Rehabilitation

---

[8]  Upon request from the court, the defendants initially offered the following as legitimate penological interests served by the Ensign Amendment and resulting BOP regulations: (1) rehabilitation; (2) punishment; (3) institutional security; (4) preventing predatory behavior; (5) preventing both consensual and non-consensual homosexual liaisons; (6) preventing the spread of sexually transmitted diseases; (7) protecting the safety and authority of prison officials; (8) the provision of a non-hostile work environment to prison staff who do not wish to be exposed to sexually explicit materials in the hands of inmates; and (9) administrative burden related to examining inmate mail.  See (Doc. Rec. No. 92.)  In their summary judgment motion, brief and supporting evidence, however, the defendants focus only on rehabilitation and institutional security.  Therefore, we too will only focus on rehabilitation and institutional security, while recognizing that these two interests will at times incorporate some of the other interests initially offered by the defendants.

[9]  The Third Circuit directed us to focus only on rehabilitation because it did not find the interest of institutional security was properly before it.  Ramirez, 379 F.3d at 131 n.5.  Because we do find that this interest is now properly before us, we will consider it.

The Supreme Court has recognized rehabilitation of prisoners as a valid penological interest.  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); see also Procunier v. Martinez, 416 U.S. 396, 413 (1974) (recognizing order, security, and rehabilitation as "identifiable governmental interests").  The defendants argue that the Ensign Amendment and BOP regulations serve two specific rehabilitative goals.  First, the defendants argue that by preventing prisoners access to Playboy and Penthouse, the Ensign Amendment and BOP regulations increase the chance of rehabilitation for sex offenders by decreasing the chance that sex offenders would have access to pornographic materials.  Second, the defendants argue that much of the general prisoner inmate population suffers from sexist, misogynist views that consider people as mere objects.  By preventing prisoner access to pornography - materials which perpetuate the belief that women can be viewed as mere sexual objects - defendants argue the Ensign Amendment and BOP regulations "assists prison administrators' rehabilitative efforts in shaping inmates' fundamentally criminogenic culture and replacing it with pro-social attitudes, values and behaviors." (Def.'s Br., Rec. Doc. No. 103, at 11).  In support of these arguments, the defendants offer an expert report from correctional psychologist Dr. Andres E. Hernandez, a declaration from psychologist Dr. Joyce K. Conley, and a declaration from Kendahl Gainer, a case manager from LSCI

Allenwood.

As discussed more fully below, we find that defendants have met their burden and have demonstrated that the Ensign Amendment and BOP regulations are rationally connected to supporting these two legitimate rehabilitative goals. We further find plaintiff has not presented sufficient evidence to rebut defendants.

<u>a.  Rehabilitating Sex Offenders</u>

Regarding the first rehabilitative goal, defendants have submitted through Gainer's declaration that 2.8% of the inmate population at LSCI Allenwood are sex offenders, and are kept in the general population.  <u>See</u> (Gainer Decl., Ex. 2,  Rec. Doc. No. 103, ¶ 7).  Based on his extensive clinical experience and other scientific studies, Dr. Hernandez concludes that exposure to pornographic[10] materials has a deleterious effect on the rehabilitation of sex offenders.  (Dr. Hernandez Rep., Ex. 3, Rec. Doc. No. 103, ¶¶ 17, 27, and 30) (hereinafter "Dr. Hernandez Rep.").[11]  As defendants argue and as has been recognized by the Supreme Court, once a

---

[10]  As discussed in further detail, Dr. Hernandez considers <u>Playboy</u> and <u>Penthouse</u> as pornographic materials.  (Dr. Hernandez Suppl. Rep., Ex. 4, Rec. Doc. No. ¶ 3) (hereinafter "Dr. Hernandez Suppl. Rep.").

[11]  Dr. Hernandez has a doctorate in clinical psychology and since 1997, has been the Director of the Sex Offender Treatment Program and Hypersexuality Management Program, Federal Correctional Institution Butner, Federal Bureau of Prisons.  <u>See</u> (Dr. Hernandez Rep., ¶ 2.)

14

publication reaches one prisoner, it is reasonable to expect that the material will be

circulated among the other prisoners.  See Thornburgh v. Abbott, 490 U.S. 401,

412 (1989) ("material of this kind reasonably may be expected to circulate among

prisoners").  Therefore, Dr. Hernandez and defendants argue that permitting access

to pornography to the general population would increase the chance that sex

offenders would have access to these materials, thereby disrupting their

rehabilitative efforts.  Even if the BOP specifically forbade sex offenders from

receiving such materials, this would not act as a sufficient deterrent because they

would eventually get access to these materials from the general inmate population.

See (Dr. Hernandez Rep., ¶ 27) ("inmates would share, distribute and sell

pornography to those who most desire it, and are most vulnerable to its negative

influence.")  By preventing the general population from receiving pornography,

defendants and Dr. Hernandez argue that the Ensign Amendment and BOP

regulations help prevent the sex offender population from receiving such

pornographic materials that are so deleterious to their rehabilitation.[12]

After reviewing Dr. Hernandez' report, we find that restricting the general

inmate population's access to Playboy and Penthouse is rationally related to the

_____

[12] Dr. Conley concurs with Dr. Hernandez' statements and assessments.  See
(Dr. Conley Declaration, Rec. Doc. No. 114-2, at ¶ 6) (hereinafter "Dr. Conley
Decl.")

legitimate penological interest of promoting the rehabilitation of sex offenders.

Clearly, as even the Third Circuit recognizes and as Dr. Hernandez opines, access

to these materials would have a negative effect on the rehabilitation of sex

offenders.  See Ramirez, 379 F.3d at 129 (recognizing that if the Ensign

Amendment was limited to sex offenders, then the first prong of the Turner

analysis could be resolved by common sense).  We agree that sex offenders would

gain access to these deleterious materials if such materials were possessed by non-

sex offenders.  Therefore, preventing the general population from receiving

pornographic materials such as Playboy and Penthouse likewise helps prevent sex

offenders from receiving such materials.  We also find that simply preventing sex

offenders from directly receiving pornographic materials would not act as a

sufficient deterrent.

Plaintiff's expert, William S. Keller, a former warden with the BOP,[13] does

not disagree that pornographic materials - including Playboy and Penthouse - are

detrimental to the rehabilitation of sex offenders.  See (Keller Supplemental

Report, Rec. Doc. No. 101-2, at 11) (hereinafter "Keller Suppl. Rep.") ("I do agree

---

[13] Mr. Keller is also a retired Senior Deputy Regional Director.  He also
served as an associate warden, and has had almost twenty seven years of
experience working with the BOP.  See (Keller Report, Rec. Doc. 101-2, at 8)
(hereinafter "Keller Rep.")

with the assertion of Dr. Hernandez . . . that sex offenders should not be a consumer of pornography or magazines such as Playboy and <u>Penthouse</u>.")  Nor does the plaintiff or Mr. Keller challenge defendants' claim that sex offenders would obtain access to <u>Playboy</u> and <u>Penthouse</u> if the general population had access to such materials.  Instead, the plaintiff argues that the "'proscription rationally applies to such a small percentage of the BOP inmate population that its connection to the government's rehabilitative interest is so remote as to render it arbitrary or irrational.'"  <u>See</u> (Pl's Br., Doc. Rec. No. 99, at 7) (quoting <u>Ramirez</u>, 379 F.3d at 130) (citations omitted.)

    We disagree for two reasons.  First, as discussed more fully below, we find that the Ensign Amendment and BOP regulations' restrictions on <u>Playboy</u> and <u>Penthouse</u> promote the rehabilitation of the whole inmate population, not just sex offenders.  Second, even if the restrictions promoted only the rehabilitation of sex offenders, the effect such materials have on sex offenders is so obvious and considerable, and the chance of sex offenders receiving such materials from the general population so significant and unchallenged, that preventing the general inmate population access to <u>Playboy</u> and <u>Penthouse</u> for the sake of the rehabilitation of sex offenders is rational.

    As plaintiff argues, we are cognizant that less than 3% of the inmate

population at LSCI-Allenwood are sex offenders, and that the Third Circuit stated

that the common sense connection between the Ensign Amendment and the

rehabilitation of sex offenders "becomes attenuated upon consideration of the

entire population of BOP inmates, such that a factual record becomes necessary for

determining the rationality of the amendment's overall connection to rehabilitative

interests." Ramirez, 379 F.3d at 128.  The Third Circuit, however, made this

determination without the benefit of a factual record, and predicated its assertion

on common sense being the sole rationale for restricting sex offenders' access to

pornography.  Here, a factual record is developed, which strengthens the common

sense rationale.  It establishes that even though sex offenders may be a small

percentage of the population, the government's interest in rehabilitating sex

offenders is so strong that we cannot find it arbitrary or irrational to prevent the

general inmate population from possessing Playboy and Penthouse for the sake of

rehabilitating sex offenders.  In other words, the plaintiff's First Amendment

interest in viewing pornographic materials such as Playboy and Penthouse does not

trump the government's much more important interest in rehabilitating sex

offenders.  Therefore, we find the Ensign Amendment and BOP regulations as

applied to plaintiff are rationally related to the legitimate penological interest of

rehabilitating sex offenders.

### b.  Rehabilitating the General Inmate Population

Defendants argue that the second rehabilitative goal served by restricting

prisoner access to Playboy and Penthouse is the rehabilitation of the general inmate

population's mindset.  According to studies reviewed and opined upon by Dr.

Hernandez, "exposure to both non-violent and violent pornography affects both

aggressive attitudes and behaviors."  (Dr. Hernandez Rep., ¶ 21.)  These studies

concluded that pornography enhances "negative attitudes toward women and

increases acceptance of rape myths; lower inhibitions to aggress against women;

and produces subsequent violent sexual fantasies in the consumer of pornography."

(Id. at ¶ 18.)  Dr. Hernandez' clinical experience working with inmates supports

these findings.  He opines that prisoners bring a 'cultural milieu' to prison that is

criminogenic, sexist and misogynist.  (Id. at ¶ 28.)  According to Dr. Hernandez,

prisoners generally - sex offenders and non-sex offenders alike - view "human

beings as mere objects for personal advancement and satisfaction."  (Id.)  Exposure

to pornography furthers this view, by "perpetuat[ing] the belief that women are

sexual objects for the use and sexual gratification of men."  (Id.) Therefore, Dr.

Hernandez concludes that the "Ensign Amendment, through restriction of

pornography, assists prison administrators in shaping inmates' fundamentally

criminogenic culture and replacing it with prosocial attitudes, values and

behaviors." (Id.)  Dr. Conley concurs with Dr. Hernandez' assessment and notes

that the Ensign Amendment helps the prison staff shift the criminal mindset of

inmates.  See (Dr. Conley Decl. at ¶ 10.)

After reviewing Dr. Hernandez' report and Dr. Conley's declaration, we find

the defendants have demonstrated that the policy of restricting inmate access to

Playboy and Penthouse is rationally related to the interest of rehabilitating the

prisoner's criminogenic culture with more prosocial attitudes.  Dr. Hernandez,

whose qualifications and background plaintiff does not challenge, has provided

expert testimony that establishes that: (1) pornography such as Playboy and

Penthouse has a negative effect on criminals, an effect that promotes the sexual

objectification of women; (2) criminals generally possess a mindset that views

humans as mere objects useful only for the criminals' own personal satisfaction;

(3) exposure to Playboy and Penthouse helps reinforce this criminal mindset by

perpetuating the belief that women are sexual objects useful only for the sexual

gratification of men; and (4) restricting sex offenders and non-sex offenders'

exposure to Playboy and Penthouse assists administrators in reinforcing prosocial

attitudes and behaviors by removing material from the prisoners' possession that

reinforces negative and harmful social attitudes.  Dr. Conley concurs with these

findings.  We agree that given these conditions, restricting the general inmate

population's access to pornography, including <u>Playboy</u> and <u>Penthouse</u>, rationally

relates to the legitimate penological interest of rehabilitating the criminal mindset

of the general inmate population.

Plaintiff offers several counter-arguments, none of which we find

persuasive.  First, plaintiff asserts that Dr. Hernandez' opinion should be

discounted because his analysis does not incorporate the effect <u>Playboy</u> and

<u>Penthouse</u> has on inmates.  Citing Black's Law Dictionary, plaintiff argues that the

definition of pornography equates pornography with obscenity, and that <u>Playboy</u>

and <u>Penthouse</u> are not obscene.  Therefore, according to plaintiff, when Dr.

Hernandez opines on the effect pornography has on inmates, he is referring to

obscene materials and not to <u>Playboy</u> and <u>Penthouse</u>, which according to plaintiff

are non-pornographic.

Dr. Hernandez' supplemental report, however, establishes that plaintiff's

argument is wrong.  In his supplemental report, Dr. Hernandez explicitly refers to

<u>Playboy</u> and <u>Penthouse</u> as "pornographic magazines."  (Dr. Hernandez Suppl.

Rep., ¶ 3.)  He further clarifies his opinion by stating that "based on my clinical

and scientific training and experience as a clinical psychologist, I wholeheartedly

disagree with the view that pornography (of any kind) is acceptable in a

correctional agency."  (Id.)  Regardless as to whether <u>Playboy</u> and <u>Penthouse</u> fit

21

within Black's Law Dictionary's definition of pornography, clearly Dr. Hernandez considered such materials pornographic when making his findings.  As a result, plaintiff's first argument that Dr. Hernandez' findings did not consider the effect Playboy and Penthouse have on prisoners is without merit.

Plaintiff's second argument is that based on Mr. Keller's experience as a warden, distributing Playboy and Penthouse to inmates has no deleterious effect on the rehabilitation of inmates generally.  Therefore, based on Mr. Keller's experience and testimony, the court should discount Dr. Hernandez' expert report, or at the very least rule that Mr. Keller's testimony raises a genuine issue of material fact sufficient to defeat defendants' summary judgment motion.

This argument ignores the fact that under Turner and Banks, we are required to defer to the judgment of the BOP and the legislature, and not the plaintiff or his expert, if we determine that the government's policy is independently rational. Turner, 482 at 84-90; Banks, 126 S. Ct. At 2578.  This is not a situation in which plaintiff is attacking the credibility of Dr. Hernandez' expertise, or the factual underpinnings of his experience or the studies upon which he relied.  Instead, plaintiff is offering an expert - Mr. Keller - whose different experience in corrections leads him to conclude that Playboy and Penthouse do not have a negative rehabilitative effect on inmates.  This is a classic case in which the dispute

22

in question is one of professional judgment.  As the Supreme Court and the Third

Circuit commands, in such an instance "our inferences must accord deference to

the views of prison authorities."  <u>Banks</u>, 126 S. Ct. at 2578; <u>see also</u> <u>Ramirez</u>, 379

F.3d at 130 (noting that courts cannot substitute their own judgment in place of the

legislative or executive branches when the government advances a rational

position).  Because we find that the government advances a rational position that

<u>Playboy</u> and <u>Penthouse</u> would have a deleterious effect on the rehabilitation of

prisoners generally, we must defer to the professional judgment of the government

and Dr. Hernandez.

If we were to rule otherwise - either grant plaintiff's summary judgment

motion, or find a genuine issue of material fact based on the difference of opinion

between Dr. Hernandez and Mr. Keller - we would ignore the Third Circuit's

mandate in <u>Waterman</u>.  In that case, the Third Circuit reversed a district court

which had originally ruled that a New Jersey statute prohibiting sex offenders

access to pornography was unconstitutional.  <u>Waterman</u>, 183 F.3d at 220.  The

district court had ruled that the statute did not have a rational connection to the

legitimate penological interest of rehabilitating sex offenders in part because the

experts in that case disagreed on the effect pornographic materials had on sex

offenders.  <u>Id</u>. at 216.  In an opinion by then Judge Alito, the Third Circuit reversed

and ruled that the district court was wrong to base its ruling on the difference of opinion among the experts. <u>Id</u>. Instead of choosing between two expert opinions to determine which is "more reasonable or "more convincing," the Third Circuit ruled that district courts must determine whether the justification offered by the government is rational, and if so, then the courts must defer to the government's judgment. <u>Id</u>. at 217.

In the instant case, defendants have offered a reasonable justification for prohibiting <u>Playboy</u> and <u>Penthouse</u> for the sake of rehabilitating all prisoners, a justification that plaintiff has not refuted with any other evidence other than the different professional judgment of Mr. Keller. In such an instance, we are not only prohibited from deferring to the judgment of the plaintiff's expert Mr. Keller, but we must necessarily defer to the professional judgment of the government's expert Dr. Hernandez and not rule that there is a genuine issue of material fact.

Finally, plaintiff argues that the court should defer to the BOP's former policy, which left it to the individual warden's discretion as to whether the prisoners could possess <u>Playboy</u> or <u>Penthouse</u>. Plaintiff reasons that because the BOP has more expertise in the field of corrections and penology than the legislature, coupled with the lack of legislative history behind the Ensign Amendment, the court should defer to BOP's former policy and not the policies

associated with the enforcement of the Ensign Amendment.

This argument lacks merit because it does not establish that the Ensign Amendment is irrational or arbitrary.  Simply because the allegedly more experienced BOP chose a former policy distinct from the new policy chosen by the legislature does not necessarily mean that the legislature's policy is irrational. Rather, if we accept plaintiff's assertion that the BOP has more expertise in this area than the legislature, at best plaintiff's argument establishes that the BOP's former policy is a more rational choice than the one chosen by the legislature.  As we have already discussed, however, the issue for the court is not whether the legislature could have chosen a more rational approach, but whether the approach the legislature did choose was a rational one.  Because we find the Ensign Amendment and resulting BOP regulations' ban on <u>Playboy</u> and <u>Penthouse</u> rationally relates to legitimate penological interests, the fact the BOP had instituted a different policy prior to the Ensign Amendment is irrelevant.[14]

---

[14] We also reject plaintiff's suggestion that the alleged dearth of legislative history has any bearing on the legitimacy of the Ensign Amendment's purpose. <u>See</u> <u>Waterman</u>, 183 F.3d at 214 ("The absence of legislative facts has no bearing on whether a statute's purpose is legitimate.") (citations omitted).

## 2. Institutional Security

In addition to rehabilitation, the defendants assert that institutional security is another penological interest served by the Ensign Amendment and the resulting BOP regulations. The Supreme Court has called institutional security "perhaps the most legitimate of penological goals." Overton, 539 U.S. at 133. Defendants argue that this very important penological goal is served because restricting prisoner access to Playboy and Penthouse reduces an inmate's urge for sexual acts and sexual violence.

Specifically, Dr. Hernandez states that "after viewing pornography, criminals were more likely than non-criminals to perform a sexual act such as masturbation, consensual, or criminal sex." (Dr. Hernandez Rep., ¶ 25.) Dr. Hernandez reports that approximately 5,000 inmates may have incident reports citing them for improper sexual acting out, and that the vast majority of these inmates (89%) are not sex offenders. (Id. at ¶ 29.) Based on his experience as a correctional psychologist, Dr. Hernandez opines "such sexual acting out is highly disruptive to a correctional environment." (Id. at ¶ 25.) He also opines that pornography increases an inmate's urge to engage in sexual violence towards fellow inmates as well as prisoner staff, primarily female. (Id. at ¶ 29.) Dr. Conley also states that "to allow the use of pornography in prison would jeopardize the

safety of female correctional staff."  (Dr. Conley Decl., ¶ 22.)  Dr. Hernandez

concludes that the Ensign Amendment serves the penological interests of

institutional security by "restricting access to pornography that would otherwise

increase inmates' sexual acting out (e.g., masturbation, consensual sex among

inmates, incidents of exhibitionism, and sexual violence against inmates and

staff)."  (Dr. Hernandez Rep., ¶ 29.)

 After reviewing Dr. Hernandez' expert report and Dr. Conley's declaration,

we find that restricting prisoner access to <u>Playboy</u> and <u>Penthouse</u> furthers the

legitimate penological interest of institutional security.  Dr. Hernandez' report

demonstrates that viewing pornography such as <u>Playboy</u> and <u>Penthouse</u> increases

the chance inmates will engage in sexual acts and/or sexual violence, that such acts

are disruptive to the order of the prisons, and that such acts pose a threat to the

security of the inmate population and also the safety of the prison staff, especially

female staff.  These findings establish that restricting prisoner access to <u>Playboy</u>

and <u>Penthouse</u> is rational because the restriction reduces the risk that inmates will

engage in disruptive sexual acts and/or sexual violence, thereby promoting

institutional security.

 Again, plaintiff does not challenge the studies or experience Dr. Hernandez

relies upon in making his findings, but rather offers Mr. Keller's opinion to rebut

Dr. Hernandez' opinion.  Essentially, plaintiff is again requesting the court to choose between two different professional judgments.  And again, we must defer to the government.  Therefore, consistent with Banks and Turner, we defer to Dr. Hernandez' opinion and not Mr. Keller's.

Furthermore, even if we were to consider Mr. Keller's opinion, the basis for his opinion does not provide a sufficient justification for finding the Ensign Amendment and resulting BOP regulations irrational.  Mr. Keller opines that because he never experienced any security issues when he permitted prisoners to possess Playboy and Penthouse, institutional security cannot act as a basis for banning these materials. (Keller's Rep. at 9.)  Even if we impute Mr. Keller's idiosyncratic experience as a warden to all prisons controlled by the BOP, and assume *arguendo* that none of the BOP prisons experienced security issues resulting from prisoner possession of Playboy and Penthouse, this in of itself would not render the Ensign Amendment's prohibition of Playboy and Penthouse irrational.  Under Turner's first prong, "to show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future."  Mauro v. Arpaio, 188 F.3d 1054, 1060 (9th Cir. 1999) (citing Thornburgh, 490 U.S. at 417); see also Espinoza v. Wilson,

814 F.2d 1093, 1098 (6th Cir. 1987) (noting that prison officials need not show an actual danger exists to support the reasonableness of a prison regulation, but rather only need to show a potential danger exists without the challenged regulation) (citations omitted).  Instead, Dr. Hernandez and the government need only show a potential danger existed by permitting prisoner access to Playboy and Penthouse, which Dr. Hernandez has done through his report.  Therefore, even if Mr. Keller's experience was consistent with the rest of the BOP, the fact that access to Playboy and Penthouse has not yet actually caused a security issue does not render the Ensign Amendment and resulting BOP regulations irrational.[15]

For the reasons stated above, we find that defendants have established that the Ensign Amendment and BOP regulations as applied to Playboy and Penthouse reasonably serve legitimate penological interests concerning rehabilitation and institutional security.  Therefore, defendants have met the first prong under Turner's analysis.

---

[15]  We also note that Mr. Keller's experience has not been the same in all prisons.  In Mauro, inmates at a state institution had used nude photographs to draw comparisons to prisoners' significant others, which led to fights.  188 F.3d at 1060.  In addition, prisoners had used such photographs to harass female staff and to masturbate in front of female staff.  Id.  Clearly, Mauro establishes that actual issues of security connected to prisoner possession of pornography have arisen in facilities comparable to the ones controlled by the BOP.

**B.  Alternative Means**

The second factor under <u>Turner</u> requires the court to determine whether "there are alternative means of exercising the right that remain open to prison inmates."  482 U.S. at 90.  Plaintiff concedes that this factor is met because the BOP's regulations permit prisoners to receive a broad range of publications that do not depict nudity.  (Rec. Doc. No. 99, at 9).  We agree and find that the second factor under <u>Turner</u> is satisfied.

**C.  Impact of Accommodation on Others**

The third factor under <u>Turner</u> is the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  482 U.S. at 90.  In <u>Turner</u>, the Court stated that when "accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."  <u>Id</u>.  This "ripple effect" is present when the right in question is the right to receive publications from outside the prison.  <u>Thornburgh</u>, 490 U.S. at 418.   This is because of the high probability that the material will circulate within the prison.  <u>Id</u>.  Therefore, we will again defer to the informed discretion of corrections officials while analyzing this factor.

Permitting possession of pornography by some inmates can have a profound

impact on other inmates and guards.  As we have already discussed in detail, Dr.

Hernandez opined that exposure to pornography of any kind affects a prisoner's

aggressive behavior, that criminals are more likely than non-criminals to perform

sexual acts after viewing pornography, and that viewing pornography increases the

risk that a prisoner will engage in sexual violence toward fellow inmates and

prison staff, particularly female staff.  (Dr. Hernandez Rep., ¶¶ 21, 25, and 29.)

Similarly, Dr. Conley stated that prisoner possession of pornography jeopardizes

the safety of the female correctional staff.  (Dr. Conley Rep., ¶ 22.)  Therefore, the

defendants' experts make it clear that pornography can lead to violence against

other inmates and guards, which obviously means prisoner possession of

pornography has a negative impact on other inmates and guards.

The only argument plaintiff offers in response is that his expert, Mr. Keller,

has concluded that pornography does not cause violence or disruption in prison.

Again, plaintiff is requesting the court to defer to his expert over the defendants'

expert.  And again, we are constrained by Banks and Turner to defer to the

government's expert and reject plaintiff's argument.  Because defendants have met

their burden under Turner's third prong and plaintiff has not met his, we find that

possession of pornography has a profound impact on other inmates and guards and

conclude that the third Turner factor is satisfied.

31

## D. Ready Alternatives

The fourth factor under <u>Turner</u> is the "absence of ready alternatives." 482 U.S. at 90. Such an absence is evidence of the reasonableness of a prison regulation. <u>Id</u>. (citation omitted). It follows that the existence of an easy alternative is evidence that the regulation is not reasonable. <u>Id</u>. Still, the Supreme Court made it clear that this was not a "least restrictive alternative" test. <u>Id</u>. Rather, if the plaintiff "can point to an alternative that fully accommodates the prisoner's rights at <u>de</u> <u>minimi</u>s cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." <u>Id</u>.

Plaintiff offers several alternatives to the regulation. First, he argues that a requirement could be formulated prohibiting sex offenders and sexual deviates from possessing pornography and that this requirement could be enforced by the prison guards and by punishment for sex offenders caught in violation of the regulation. (Rec. Doc. No. 99, at 9.) Second, he argues that the BOP could house sex offenders and sexual deviates in one institution from the general population and simply deny them access to pornography. (<u>Id.</u> at 9-10.) Third, he argues that the BOP could return to its pre-Ensign Amendment regulations and simply have its wardens determine which publications pose a threat to security. (<u>Id.</u> at 9-11.)

Finally, he proposes the concept of a common reading room where the pornography can be viewed only by certain individuals.  (Id. at 12.)

As to plaintiff's first alternative, banning only sex offenders and sexual deviates from possessing pornography must be rejected as an alternative for several reasons.  First, we have already concluded that prohibiting possession of pornography rationally relates to the rehabilitation of all prisoners, not just sex offenders.  Similarly, we concluded that institutional security is better promoted by a ban as to all prisoners, not just sex offenders.  Banning only sex offenders and sexual deviates from possessing pornography would not only impose more than a de minimis cost to these valid penological interests, it would completely ignore them.  Secondly, such a ban would pose more than a de minimus cost to the rehabilitation of sex offenders.  As we have already discussed, sex offenders would still be able to obtain pornography from other prisoners.  (Conley Decl., ¶ 14.) Furthermore, Dr. Conley's declaration states that punishment for violations of such a ban would not adequately deter sex offenders from attempting to obtain pornography.  (Id. ¶ 15.)  Therefore, we will reject this option as an alternative.

As to plaintiff's second alternative, housing sex offenders and sexual deviates in one institution must also be rejected.  Again, this alternative would completely ignore our conclusions that a ban on possession of pornography that

applies to all prisoners would better promote rehabilitation and institutional security. Similarly, such a ban would pose more than a <u>de</u> <u>minimus</u> cost to the rehabilitation of sex offenders. Both our common sense and the declaration of Dr. Conley conclude that building an entire institution is a massive undertaking for the BOP, not a <u>de</u> <u>minimus</u> cost. (Conley Decl., ¶¶ 16-19.) Therefore, we will reject this alternative as well.

Similarly, the alternative of having a common reading room must be rejected for similar reasons. Again, it ignores our conclusions that a ban on possession of pornography that applies to all prisoners would better promote rehabilitation and institutional security. Furthermore, it does not pose a <u>de</u> <u>minimus</u> cost to the rehabilitation of sex offenders. This alternative would require its own room specifically for the material in question because only certain inmates would be able to view the material. Due to the limited amount of space in the BOP's facilities and the additional supervision that would be required of such a room, this does not appear to be a <u>de</u> <u>minimus</u> cost. (Conley Decl., ¶ 23.) Therefore, this alternative must be rejected as well.

Finally, returning to pre-Ensign Amendment regulations will be rejected as well. These regulations allowed some pornography to enter the prison. Therefore, such an alternative faces the same flaw as the three previous alternatives. It would

pose much more than simply a <u>de</u> <u>minimus</u> cost to the valid penological interests of promoting the rehabilitation of all prisoners and institutional security.  (Conley Decl., ¶ 19.)  Similarly, it would pose more than a <u>de</u> <u>minimus</u> cost to the rehabilitation of sex offenders.  As we have already extensively discussed, once the material is within the prisons, it is virtually inevitable that it will wind up in the hands of sex offenders because of the high probability that the material would circulate within the prison.  (Conley Decl., ¶ 14.)  Therefore, this alternative is rejected as well.  Thus, having rejected each of the plaintiff's proposed alternatives, we find that there is an absence of ready alternatives.

**CONCLUSION:**

For the reasons discussed above, we find that the Ensign Amendment and BOP regulations as applied to <u>Playboy</u> and <u>Penthouse</u> satisfy <u>Turner</u>'s four-factor reasonableness test and is therefore constitutional.  We will grant defendants' motion for summary judgment.  Plaintiff's cross motion for summary judgment will be denied.


       s/ James F. McClure, Jr

James F. McClure, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARC RAMIREZ                          :
                                      :
                    Plaintiff         :          Case No. 4:97-CV-0359
          v.                          :
                                      :          (Judge McClure)
MICHAEL V. PUGH, et al.               :
                                      :
                    Defendants.       :

**ORDER**

March 29, 2007

For the reasons set forth in the accompanying memorandum,

**NOW, THEREFORE, IT IS ORDERED THAT,**

1.    Plaintiff's motion for summary judgment is denied.  (Rec. Doc. No. 95).

2.    Defendant's motion for summary judgment is granted.  (Rec. Doc. No. 96).

3.    Final judgment is entered in favor of defendants and against plaintiff.

4.    The clerk is directed to close the case file.


                                    __ s/ James F. McClure, Jr _____
                                    James F. McClure, Jr.
                                    United States District Judge